IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
STATEBORO DIVISION

|  |  |  |
|---|---|---|
| AMCO INSURANCE COMPANY, A/S/O MCCORKLE WHOLESALE, INC., | * | |
| | * | |
| Plaintiff, | * | CV 617-022 |
| | * | |
| v. | * | |
| | * | |
| TAF, INC. d/b/a METTER SPORTS STORE, | * | |
| | * | |
| Defendant. | * | |

---

**O R D E R**

---

Before the Court are the following motions: (1) Plaintiff's motion for partial summary judgment (Doc. 18); (2) Plaintiff's motion to exclude testimony of defense expert William Creeden, P.E. (Doc. 20); (3) Plaintiff's motion to exclude testimony of defense expert Mark M. Ruddy (Doc. 21); (4) Defendant's motion to exclude testimony of plaintiff expert Michael R. Austin (Doc. 22); (5) Defendant's motion to exclude testimony of plaintiff expert Jeffrey C. Smith (Doc. 23); (6) Defendant's motion to exclude testimony of plaintiff expert Bryan K. Cash (Doc. 24); and (7) Defendant's motion for oral argument on each of the aforementioned motions (Doc. 31).

## I. BACKGROUND

The facts of this case are almost entirely undisputed. In 2015, McCorkle Wholesale, Inc. ("McCorkle") owned a commercial property (the "Property") located in Metter, Georgia. (Pl.'s Statement of Undisputed Material Facts, Doc. 18-1, ¶ 1.) Plaintiff, AMCO Insurance Company ("AMCO"), insured the Property. (Def.'s Statement of Undisputed Material Facts, Doc. 29-1, ¶ 1.) Defendant TAF, Inc. d/b/a Metter Sports Store ("TAF") was a tenant occupying space in the Property. (Compl., Doc. 1, at 2; Ans., Doc. 8, at 2.)

As part of its business, TAF buys and sells hunting supplies, including firearms. (Dep. of Turner Fordham, Doc. 18-4, at 33.) Turner Fordham ("Fordham") is the sole owner, president, and CEO of TAF. (Id. at 16–17.) On the evening of November 12, 2015, in TAF's store, Fordham made preparations to reblue a Browning A-5 Sweet Sixteen shotgun that TAF had recently purchased.[1] (Id. at 37–41.) As part of the rebluing process, Fordham used a torch to heat the shotgun which was resting on a gun cleaning mat. (Id. at 39, 41.) A fire ignited shortly after Fordham began the bluing process causing damage to the Property structure and contents. (Id. at 44–45.) Fordham admits that he started and is the sole cause of the fire. (Id. at 67.)

---

[1] "Bluing" is effectively a finish applied to gun metal to improve the aesthetics and durability of a firearm. (Fordham Dep. at 37, 40.)

As a result of the fire, AMCO reimbursed McCorkle in the amount of $1,047,815.11. (Dep. of Michael Austin, Doc. 22-5, at 9, 12; Doc. 18-3.) On February 1, 2017, AMCO, as subrogee for McCorkle, filed suit against TAF seeking payment of the full amount it paid McCorkle. (See generally Compl.) AMCO now seeks summary judgment on this claim. In response, TAF argues, among other things, that McCorkle was negligent per se for its alleged failure to install the proper number of fire extinguishers in accordance with regulations and that negligence contributed to the damages that the fire ultimately caused. (Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J., Doc. 29, at 2-5.) Specifically, TAF argues that AMCO is not entitled to any reimbursement, or, in the alternative, only a reimbursement adjusted for damage attributable to McCorkle's negligence. Additionally, TAF asserts that AMCO's payment to McCorkle did not properly deduct (1) depreciation to certain structural elements of the Property and (2) the value of goods salvaged from the Property following the fire.[2]

---

[2] TAF requests oral argument on all motions presently before the Court. Upon consideration of the issues presented and the parties' submissions, the Court finds that oral argument would not materially aid the Court in resolving the pending motions.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. at 323. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact:

it 'must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.'" Four Parcels of Real Prop., 941 F.2d at 1438 (quoting Celotex Corp., 477 U.S. at 331 (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" Id. (quoting Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991)).

When the movant does not carry the burden of proof at trial, it may satisfy its initial burden in one of two ways – by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606–08 (11th Cir. 1991) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp., 477 U.S. 317). The movant cannot meet its initial burden by merely declaring that the non-moving party cannot meet its burden at trial. Id.

If – and only if – the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. For example, if the movant presented evidence

affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033–34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court gave Defendant notice of the motion for summary judgment and informed it of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 19.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

**B. Discussion**

AMCO's motion for partial summary judgment sets forth three arguments: (1) AMCO is entitled to summary judgment on the issue of liability for the fire; (2) AMCO is entitled to summary judgment as to TAF's affirmative defenses; and (3) AMCO is entitled to summary judgment on $886,792.83 of undisputed damages. TAF counters that (1) there is an issue of fact as to whether McCorkle's negligence contributed to the spread and consequent damages of the fire; and (2) because there is an issue of fact related to the spread and consequent damages of the fire, the Court should not grant summary judgment on any issues.

**1. TAF's Liability**

Although neither party explicitly stated the elements for negligence in Brief, the elements are well-established in Georgia:

> (1) [a] legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

Smith v. United States, 873 F.3d 1348, 1351–52 (11th Cir. 2017) (quoting Bradley Ctr., Inc. v. Wessner, 296 S.E.2d 693, 695 (Ga. 1982)). The parties do not dispute that TAF had a legal duty to avoid setting fire to the Property, that TAF breached its duty, or that some loss or damage occurred as a result of the alleged

breach. Therefore, the only disputed issue for the purpose of AMCO's motion for partial summary judgment is causation.

"To prove causation, the plaintiff must show that the wrongdoing is both a cause in fact and a proximate cause of the injuries [alleged]." Strength v. Lovett, 714 S.E.2d 723, 727 (Ga. Ct. App. 2011). To show that the defendant's conduct is a cause in fact or actual cause of its claimed injuries, "a plaintiff ordinarily must prove that, but for this conduct, he would not have sustained the injury." Id. at 730 (quoting English v. Crenshaw Supply Co., 387 S.E.2d 628, 634 (Ga. Ct. App. 1989)). Alternatively stated, "The defendant's conduct is not a cause of the event, if the event would have occurred without it." Id. For the wrongdoing to be the proximate cause of the alleged injury,

> the injury must be the natural and probable consequence
> of the [wrongful conduct], such a consequence as under
> the surrounding circumstances of the case might and
> ought to have been foreseen by the wrong-doer as likely
> to flow from his act. The injury must be the direct
> result of the misconduct charged; but it will not be
> considered too remote if, according to the usual
> experience of mankind, the result ought to have been
> apprehended.

Id. at 727 (citing Ga. Dep't of Human Res. v. Bulbalia, 684 S.E.2d 115, 118 (Ga. Ct. App. 2010)).

The Court finds that there is no dispute of material fact as to causation. First, Fordham stated in his deposition, "I caused the fire." (Fordham Dep. at 67.) Second, but for Fordham starting the fire, the Property and its contents would not have sustained fire damage. Third, the damage done to the building was the

8

"natural and probable consequence" of starting a fire in a building and ought to have been foreseen by Fordham. Fourth, the damage caused was the direct result of the fire started by Fordham. Thus, the wrongful act of starting a fire was the actual and proximate cause of the fire which damaged the Property. Accordingly, the Court finds, as a matter of law, that TAF is liable for the damages caused by the fire.[3]

### 2. TAF's Affirmative Defenses

"[A]n affirmative defense or immunity does not eliminate 'fault' or cut off proximate cause, it only bars liability notwithstanding that the 'fault' of the tortfeasor was a proximate cause of the injury in question." Zaldiver, 774 S.E.2d at 699. "Comparative negligence is a defense that diminishes or bars the liability of the defendant notwithstanding that [its] conduct was

---

[3] TAF challenges causation by arguing that although Fordham's "actions may have led to the fire, that fire was able to spread unabated because of McCorkle's failure to have fire extinguishers in the retail space of the building, as required by Georgia law." (Def.'s Opp'n to Mot. for Partial Summ. J., at 2.) TAF's argument, however, improperly conflates proximate cause and its affirmative defenses alleging comparative negligence. See Zaldiver v. Prickett, 774 S.E.2d 688, 698 (Ga. 2015) ("Comparative negligence of the plaintiff, on the one hand, and the causal relationship between the wrongdoing of the defendant and the injury sustained by the plaintiff, on the other, are distinct questions. Comparative negligence is a defense that diminishes or bars the liability of the defendant notwithstanding that her conduct was a proximate cause of the injury to the plaintiff; the defense does not necessarily eliminate the causal connection."). Accordingly, the Court considers TAF's argument as part of its affirmative defenses.

a proximate cause of the injury to the plaintiff." Id. The

doctrine of comparative negligence states:

> [W]here the negligence of the plaintiff joins with the
> negligence of the defendant in proximately causing the
> plaintiff's injuries, the plaintiff will be precluded
> from recovering against the defendant, if the negligence
> of the plaintiff is equal or greater than that of the
> defendant, *or*, if the negligence of the plaintiff is
> less than that of the defendant, the plaintiff's
> recovery of damages will be reduced in proportion to its
> negligence.

Weston v. Dun Transp., 695 S.E.2d 279, 282 (Ga. Ct. App. 2010)

(emphasis in original). When a defendant raises an affirmative

defense, "the burden rests upon the defendant[] to establish the

truth of such affirmative defense by a preponderance of the

evidence." Brown v. Tucker, 788 S.E.2d 810, 821 (Ga. Ct. App.

2016).

TAF "concedes that its actions led to the subject fire."

(Def.'s Opp'n to Mot. for Partial Summ. J., at 1). TAF's argument,

however, is that McCorkle's failure to supply portable fire

extinguishers as required by the applicable fire code constitutes

negligence per se, and McCorkle's negligence contributed to the

damages in whole or in part by precluding Fordham's opportunity to

extinguish the fire. (Id. at 2–6.) TAF relies upon its expert,

Ronald Blankenship, to establish that the Property lacked the

sufficient number and type of fire extinguishers. (Id. at 5–6.)

Using this conclusion, TAF asserts that "there is **no dispute that**

**the premises lacked fire extinguishers in the vicinity of the fire**

10

(or the retail space in its entirety)." (Id. at 4 (emphasis in original).) Finally, TAF argues that "had McCorkle been compliant with its duty to maintain proper fire suppression equipment, [Fordham] was ready, willing, and able to utilize a fire extinguisher to control the fire." (Id.) Thus, TAF concludes that the "lack of fire extinguishers and the consequent spread of the fire (distinguishable from its cause/origin) is a legitimate basis for finding comparative fault." (Id. at 6.)

AMCO contends that TAF "cannot point to any evidence in this case that would allow it to survive summary judgment on its affirmative defenses of comparative fault." (Pl.'s Mot. for Partial Summ. J., Doc. 18, at 8.) Specifically, AMCO argues that TAF cannot establish that the lack of fire extinguishers was a cause of the damages incurred. (Id. at 9-10.) The Court agrees with AMCO's position.

Assuming TAF established McCorkle was negligent per se,[4] it has not established McCorkle's alleged negligence proximately

---

[4] AMCO additionally argues that McCorkle did not have a legal duty to provide or maintain fire extinguishers in TAF's retail space, an essential element of negligence per se. See Hubbard v. Dep't of Transp., 568 S.E.2d 559, 567 (Ga. Ct. App. 2002) ("The violation of certain mandatory regulations may also amount to negligence per se if the regulations impose a legal duty."). Although TAF points to several applicable codes requiring fire extinguishers, it fails to show whether the code imposed a legal duty on McCorkle. See id. at 567 ("Accordingly, even if we assume that [plaintiff] was within the class of persons protected by the [regulation] and that her injury was the type of harm the standards were intended to prevent, [plaintiffs] would not be entitled to partial summary judgment because they were unable to demonstrate that the [regulation] provisions were mandatory or that they created a legal duty on the part of [defendants.]"). Additionally, TAF

contributed to the harm. "Negligence per se does not equal liability per se." Norman v. Jones Lang Lasalle Americas, Inc., 627 S.E.2d 382, 389 (Ga. Ct. App. 2006). "[I]f the court finds negligence per se, the plaintiffs must then demonstrate a causal connection between the negligence per se and the injury." Id. The necessary causal connection includes establishing proximate cause. Id.

TAF has provided no evidence that the lack of fire extinguishers was causally connected to McCorkle's damages. To support its argument, TAF relies exclusively on an affidavit of Fordham and the report and deposition of its expert Ronald Blankenship.[5] The affidavit by Fordham states that he was "ready, willing, and able" to use a fire extinguisher "had one been readily available." (Aff. of Turner Fordham, Doc. 29-3, ¶ 5.) The affidavit, however, says nothing about whether Fordham believed he could have contained the fire had he used a fire extinguisher. (See generally Fordham Aff.)[6]

---

fails to identify whether it (the lessee) or McCorkle (the lessor) was the party responsible for complying with the cited codes. The Court, however, need not rule on this issue as TAF has provided no evidence that even if McCorkle did possess such a legal duty, its negligence contributed to the fire damage in this case.

[5] TAF also references its Amended Responses to Plaintiff's First Interrogatories. (Doc. 18-5.) The Amended Responses, however, contain the same statement as Fordham's Affidavit that he was "ready, willing and able to use [fire prevention equipment] to remediate or contain the fire if such equipment was reasonably available." (Id. at 11–12.)

[6] AMCO asserts that Fordham's affidavit is a sham affidavit and asks the Court to ignore it. In the Eleventh Circuit, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot

thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). In his deposition, Fordham gave the following testimony:

> Q. Okay. So the mat flash stops. You threw the can of acetone. Then you have fire on the wall. You dropped the torch. What happened next?
>
> . . .
>
> A. Threw the gloves off. Ran back and forth a few times trying to figure out what to do. Did not know. Panicking. Ran to the front of the store. Ran to the bathroom. Just not knowing what to do. I ran to the front again, then ran back to the store thinking what should I grab. What should I do. Just a state of panic.
>
> Q. Okay. All right. And what ultimately did you decide to do?
>
> A. I ran outside the front door.
>
> Q. Okay. Did you make any attempt to extinguish the fire with anything before you left?
>
> A. No, I did not.
>
> Q. Didn't have anything available to you?
>
> A. I did in the back room but never – never even crossed my mind. You know, water was the closest thing. I had – at that time the fire was so big, I didn't know what to do.
>
> Q. Okay. You didn't think you'd be able to control it?
>
> A. Not at that point I did not.

(Fordham Dep. at 53–54.) In his affidavit, Fordham asserted:

> While I was never asked at deposition, I was ready, willing, and able to utilize a fire extinguisher at the time of the fire had one been readily available. The only possible fire extinguishers in the building were not in the retail space and would have required me to pass by/through the fire. I am fully aware as to how to use a fire extinguisher.

(Fordham Aff. ¶¶ 5–6.) The question of whether to ignore Fordham's affidavit is a close one. The Court, however, declines to reach this

Moreover, TAF offers no expert witness testimony on the size of the fire or the potential effectiveness of a fire extinguisher given the size of the fire. Blankenship confirmed that the scope of his report was "merely to determine what types of portable fire extinguishers should have been" in the building. (Dep. of Ronald Blankenship, Doc. 29-2, at 94.) Blankenship's Report provides no evidence that the fire could have been suppressed by a fire extinguisher, much less that it could have been suppressed by the fire extinguisher required by the applicable code. (See Blankenship Expert Report ("Blankenship Report"), Doc. 18-7.) Notably, when asked in his deposition whether he believed Fordham could have put out the fire with a fire extinguisher of the type required by the ordinance, Blankenship testified that "[w]e don't know if he could just put it out or not." (Blankenship Dep. at 57.)

Finally, even if McCorkle had installed fire extinguishers as suggested by the National Fire Code, it is mere guesswork to conclude that Fordham could have accessed the fire extinguisher. TAF offers no evidence that the fire extinguisher would have been placed in an area that Fordham could have accessed, and Fordham admits that a fire extinguisher was available in the retail space

---

issue because Fordham's affidavit still fails to establish a genuine issue of material fact as to causation.

but not accessible due to the location of the fire. (Fordham Dep. at 54; Blankenship Report at 6.)

In conclusion, no evidence in the record creates a genuine issue of material fact regarding whether Fordham could have controlled or extinguished the rapidly growing fire. Any contention that additional fire extinguishers would have neutralized some of the damage is speculation. While it is conceivable that had Fordham obtained a fire extinguisher as the fire swiftly spread and had some impact on the fire, "[a] mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, . . . it becomes the duty of the court to grant summary judgment." Feazell v. Gregg, 607 S.E.2d 253, 257 (Ga. Ct. App. 2004); accord Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (speculation or conjecture does not create a genuine issue of material fact). Accordingly, the Court concludes that summary judgment is appropriate.[7] See Anderson, 477 U.S. at 250 ("If the evidence is

---

[7] This case presents facts similar to Dart Indus., Inc. v. Acor, 355 F. App'x 295 (11th Cir. 2009) (per curiam). In that case, Dart owned a building that the defendant was leasing. The defendant counterclaimed against the plaintiff for its failure to maintain a properly functioning fire suppression system. Although applying Tennessee law, the Eleventh Circuit Court of Appeals concluded that even assuming that the plaintiff retained a duty to maintain the fire suppression system in the building as its owner, and even assuming that duty was breached, the counterclaim failed because of "insufficient evidence that an operational fire suppression system would have reduced [counterclaim-plaintiff]'s losses." Id. at 296. Therefore, absent evidence establishing that the presence of additional fire extinguishers would have curtailed McCorkle's damages, TAF's affirmative defenses alleging comparative negligence fail as a matter of law.

merely colorable, or is not significantly probative, summary judgment may be granted.").

### 3. Damages

In its motion for partial summary judgment, AMCO also asks the Court to declare that $886,792.83 in damages is not in dispute. In support of this assertion, AMCO argues that once the Court concludes that TAF is liable for the fire and rejects its affirmative defenses, as a matter of law, the only dispute that remains is conflicting expert testimony regarding damages for depreciation and salvage in the amount of $161,022.28. (Pl.'s Mot. for Partial Summ. J., at 10-12).

In response, TAF concedes that "Plaintiff alleges damages of $1,047,815.11" and "defense experts reduce this amount to $886,792.83." (Def.'s Opp'n to Mot. for Partial Summ. J., at 7.) TAF further argues that the remaining $886,792.83 in damages is only in dispute based upon "Plaintiff's apportionment of liability." (Id.) However, as discussed *supra*, AMCO is entitled to judgment on its negligence claim and against TAF's affirmative defenses as a matter of law. As such, summary judgment is proper with regards to TAF's liability in the amount of $886,792.83 in undisputed damages.

### III. MOTIONS TO EXCLUDE

Both AMCO and TAF have filed numerous motions to exclude testimony of the other side's expert witnesses. AMCO seeks to

exclude TAF's experts William Creeden, P.E. (Doc. 20) and Mark M.

Ruddy (Doc. 21).  TAF seeks to exclude AMCO's experts Michael R.

Austin (Doc. 22), Jeffrey C. Smith (Doc. 23), and Bryan M. Cash

(Doc. 24).

> Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles
> and methods; and

> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

"As the Supreme Court recognized in Daubert v. Merrell Dow Pharms.,

Inc., [509 U.S. 579 (1993)], Rule 702 plainly contemplates that

the district court will serve as a gatekeeper to the admission of

[expert] testimony."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK

Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003).  "The burden of laying

the proper foundation for the admission of the expert testimony is

on the party offering the expert, and admissibility must be shown

by a preponderance of the evidence."  Allison v. McGhan Med. Corp.,

184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has explained that district courts are

to engage in a three-part inquiry to determine the admissibility

of expert testimony under Rule 702. <u>Quiet Tech.</u>, 326 F.3d at 1340.

Specifically, the court must consider whether:

> (1) [t]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> at 1340–41.

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. <u>Trilink Saw Chain, LLC v. Blount, Inc.</u>, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008). "A witness's qualifications must correspond to the subject matter of his proffered testimony." <u>Anderson v. Columbia Cty.</u>, No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing <u>Jones v. Lincoln Elec. Co.</u>, 188 F.3d 809, 723 (7th Cir. 1999)). However, an expert's training need not be narrowly tailored to match the exact point of dispute. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. In <u>Daubert</u>, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592–93. There are four factors that courts should

consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004). Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's notes to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, neither an expert's

qualifications and experience alone nor his unexplained assurance that his or her opinions rely on accepted principles is sufficient. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1244 (11th Cir. 2005); Frazier, 387 F.3d at 1261. Moreover, when analyzing a witness's reliability, courts must be careful to focus on the expert's principles and methodology rather than the scientific conclusions that they generate. Daubert, 509 U.S. at 595.

Third, expert testimony must assist the trier of fact to decide a fact in issue. Thus, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id. at 591; Frazier, 387 F.3d at 1262. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. "Proferred expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262–63.

**A. William Creeden, P.E.**

William Creeden, P.E. offered testimony on behalf of TAF challenging specific amounts that AMCO paid to McCorkle. Creeden opined that AMCO should not have allowed approximately $7,094.00 for soda blasting the concrete floors of the Property, and AMCO improperly failed to apply depreciation to certain components of the Property resulting in an overpayment of $17,984.00. (Creeden Expert Report, Doc. 20-1, at 2, 5–6.) In total, Creeden estimates

that the unnecessary soda blasting and AMCO's failure to properly account for all depreciation resulted in an overpayment to McCorkle of approximately $25,078.00. (Id. at 2.) AMCO's motion to exclude challenges Creeden's qualification to render an opinion regarding depreciation, and, even if he is qualified, that he did not employ the proper methodology.[8]

Creeden is a structural engineer who was designated as an "engineering expert specializing in construction management and engineering services." (Creeden Expert Witness Disclosure, Doc. 20-3, at 2.) Creeden uses his expertise to evaluate the scope of the required repairs to the structural aspect of buildings; "determining which portion of the building is still usable and which portion is not." (Dep. of William Creeden, Doc. 20-2, at 33-34.) After determining the scope of the repairs, Creeden provides information to a colleague familiar with the software used to estimate the damages the insurer owes. (Id. at 34.) The software utilized at Creeden's firm to create the estimate is called Xactimate, an insurance standard software package. (Id.) As part of the total estimate, the software can develop an estimate regarding depreciation. (Id. at 60.)

---

[8] AMCO does not contest whether Creeden is qualified to render an expert opinion regarding the unnecessary use of soda blasting to clean the Property floors. (Pl.'s Mot. to Exclude Test. of Defense Expert William Creeden, P.E., Doc. 20, at 3 n.5.)

The Court agrees that Creeden is not qualified to render an opinion regarding depreciation. Estimating depreciation is an entirely different area of expertise than determining the damages suffered by the structural components of a building. Determining structural damages requires knowledge concerning the physical properties of building components and the effect of various physical stressors on those components. Depreciation involves accounting concepts and depends on the terms of the insurance contract. Although experienced in the former, Creeden recognized he lacks knowledge and experience as to the latter:

> Q: Well, and you shouldn't be considering [insurance policy terms between AMCO and McCorkle] because that has nothing to do with engineering; correct?
>
> A: We're specifically discussing his estimate. Are we not supposed to discuss his estimate? I mean, he created this estimate based on the policy language between him and their insured correct?
>
> Q: You tell me. You're the expert.
>
> A: Well, I'm sure he did.
>
> So all I'm saying is that — is that it — the way an estimate is customarily put together is what I'm commenting about. And the point I was making was that if he specifically excluded depreciation from these major components for some reason that I don't know, then that's fine. You know, I don't know what the policy says or doesn't say.
>
> But to not apply depreciation to things that are halfway through their life doesn't make any sense. It shouldn't make sense to anybody.
>
> Q: Well, again, the agreement between Nationwide and its policyholder as reflected in its policy has nothing to do with engineering; correct?

A: It has nothing to do with engineering. As far as I know, it has nothing to do with engineering, no, but it has everything to do with the estimate that we're specifically discussing right now.

Q: And we agreed that depreciation is not an engineering concept, it's an accounting concept; correct?

A: For the most part, yes.

(Creeden Dep. at 75–77.) AMCO's expert witness, insurance adjuster Michael Austin, explained why AMCO could not consider certain depreciations:

Q: Well, what about Mr. Creeden (phonetic) that we talked about a minute ago. Have you had a chance to review Mr. Creeden's report, the defendant's expert?

A: Yes, I did.

Q: Okay. And do you have any comments or criticisms of what Mr. Creeden is saying there in his report with respect to the actual cash value of construction?

A: Well, referring back to depreciation again. We are not allowed to take depreciation on hard-and-structural items that are expected to last the lifetime of the building, and this is where he's calling into my consistency. But according to Best Claims Practices, we are not allowed to take depreciation on such items that he claims need to be depreciated.

(Austin Dep. at 24.)

Additionally, Creeden is not trained to use Xactimate software; he relied on an employee in his firm who is qualified to use the software to develop the estimates (Creeden Dep. at 34), and he admits that he lacks knowledge regarding how Xactimate functions or how it calculates depreciation:

Q: But to calculate depreciation, it's got to have some kind of algorithm in it that applies a mathematical

equation to the current prices to get the ACV price; correct?

A: I don't know how it does it exactly.

Q: So as far as you know, you just put in what the current repair cost is and Xactimate will spit out a depreciated amount; is that correct?

A: I don't use the software, so exactly how that's done and the inputs and outputs, I'm not sure.

But I know that when I talk to an estimator and we're talking about depreciation, he asks me what it is and how old it is.

. . .

Q: You don't know what kind of algorithm the Xactimate program uses to calculate depreciation, do you?

A: I have no idea, no.

Q: You don't know if it uses straight-line depreciation or not; correct?

A: I don't know.

Q: You don't know if it uses the declining balance method of depreciation; correct?

A: I have no idea how Xactimate is programmed, no.

Q: Okay. You don't know if it uses the sum of years method to calculate depreciation; correct?

A: No, sir.

(Creeden Dep. at 78–80.)

In sum, the Court concludes that Creeden's engineering expertise differs from the expertise required to formulate a depreciation estimate. Because TAF has not demonstrated Creeden is qualified to offer expert testimony on the issue of

depreciation, the Court excludes the portions of Creeden's testimony opining upon AMCO's depreciation calculations.

## B. Mark M. Ruddy

TAF designated expert Mark Ruddy to testify regarding the amount AMCO's salvor realized in the sale of McCorkle's inventory. In Ruddy's opinion, AMCO's salvor, for a number of reasons, failed to maximize the sale of the salvaged inventory. AMCO's salvor recovered $97,355.00 in proceeds. Ruddy opines that the salvaged inventory should have demanded $265,279.20, and, after paying the salvor's commission, the salvaged inventory would have returned net proceeds of $233,299.28. (Mark M. Ruddy Expert Report ("Ruddy Report"), Doc. 21-1, at 3.)

AMCO contends that Ruddy should be disqualified as an expert for a number of reasons. First, AMCO contends that Ruddy is unqualified to deliver an expert opinion because he is a broker of salvaged goods and is not in the business of actually buying or selling salvaged goods. The Court disagrees, and Ruddy is qualified to offer expert testimony regarding the value of the salvaged inventory.

Ruddy has over forty years of experience in the salvage industry. (Dep. of Mark M. Ruddy, Doc. 21-2, at 4–5.) During his tenure as a salvor, Ruddy has valued salvaged goods and has consulted on such matters on a number of occasions. (Id. at

14-21.) For these reasons, Ruddy is qualified to offer his opinion as to the value received for McCorkle's salvaged inventory.

Second, AMCO argues that Ruddy has not employed a proper methodology for assessing the value of the salvage. AMCO relies on the fact that Ruddy received a bid for the salvaged goods and is now relaying those figures as his opinion. The Court determines Ruddy's opinion encompasses much more than merely restating the bids he solicited. Ruddy testified that the offers he received for the salvage goods were the product of bona fide negotiations. (Id. at 62-63, 68-69, 71, 80.) Moreover, Ruddy's opinion is not just limited to the actual price recovered. He explains that, in his experience with this type of inventory, AMCO's salvor packaged the inventory incorrectly and sold it to the wrong type of buyer. (Id. at 60, 73-74.) From all accounts, Ruddy contacted buyers he believed were better suited to purchase the inventory in question and negotiated a price with them as he would in the salvage sales he ordinarily brokers.[9] (Id. at 80.) Therefore, the Court is convinced that Ruddy employed a reliable methodology for the salvage industry, and his expert testimony on the value of the salvage is properly admitted.

---

[9] AMCO does not dispute that Ruddy's testimony would assist the trier of fact.

## C. Michael R. Austin

TAF seeks to exclude testimony of AMCO's proffered expert, Michael R. Austin. Austin is AMCO's employee that adjusted the claim at issue in this case. TAF contends that Austin should be excluded as an expert under each of three prongs as recited in *Quiet Tech.*, *supra*. The Court will address each in turn.

Initially, TAF argues that Austin is not qualified with any specialized or industry expertise to offer an opinion as to the fair or reasonable amounts paid in this case. TAF supports its conclusion with an assertion that Austin relied solely on the experience of others in reaching his conclusion. The Court disagrees. Austin's experience adjusting insurance claims dates back nearly thirty years. (Austin Dep. at 7.) Over the course of his career, Austin has adjusted over 10,000 claims. (Decl. of Michael R. Austin, Doc. 33-3, ¶ 8.)

The fact that Austin used information from other sources does not disqualify him as an expert. See Erebia v Allstate Prop. & Cas. Ins. Co., No. 1:15-CV-312-MHC, 2016 WL 4435089, at *7 (N.D. Ga. July 18, 2016) (citing Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co., 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009)). Further, despite TAF's argument that relying on the information of others disqualifies him from opining as to depreciation, an "expert's experience as an insurance adjuster ma[kes] him qualified to testify on depreciation." Flinch v. Owners Ins. Co., No. CV 616-169, 2017 WL 6045449, at *5 (S.D. Ga. Dec. 6, 2017)

(citing Grand Reserve of Columbus, LLC v. Property-Owners Ins. Co., No. 4:15-CV-53 (CDL), 2017 WL 2618952, at *9 (M.D. Ga. Jan. 9, 2017)). Further, Austin possesses a Level II Certification in Xactimate. (Austin Decl. ¶ 9.) For these reasons, Austin is qualified to testify regarding his estimate for the Property damage.

Next, TAF argues that Austin's methodology does not meet the requirements of Federal Rule of Evidence 702 and effectively repeats its argument that Austin incorporated data from others. Again, the Court disagrees with TAF. Austin generated the Property loss estimate using the Xactimate software and his employer's Best Claims Practices. (Austin Decl. ¶ 9; Austin Dep. at 24–25.) Austin used the software and methodology traditionally employed by insurance adjusters in formulating his estimate, and therefore, his methodology is sufficient.

Finally, TAF repeats its argument in support of its position that Austin's opinion will not assist the trier of fact because the opinion is not his own. The average lay person is generally unfamiliar with methods and procedures of insurance adjusters used to create an estimate. Thus, Austin's testimony will assist the trier of fact in its determination whether AMCO's payment to McCorkle was fair and reasonable. As AMCO has met its foundational burden, the motion to exclude Austin's testimony is denied.

## D. Jeffrey C. Smith, CPA

AMCO proffers the testimony of Jeffrey Smith on the subjects of business interruption loss and inventory loss. TAF moves to exclude this testimony, although it does not dispute any issues involving inventory loss other than salvage. Jeffrey Smith specifically testified that his inventory loss does not consider salvage. (Dep. of Jeffrey C. Smith, Doc. 23-6, at 26—27.) As the only remaining factual dispute involves salvage recovery, Smith's testimony is no longer relevant, and TAF's motion to exclude his testimony is now moot.

## E. Bryan K. Cash

The final disputed expert is AMCO's expert on the origin and cause of the fire. Specifically, Cash's report concludes that the fire originated at the workbench where Fordham began bluing the shotgun and spread when Fordham threw a can of acetone. (Bryan K. Cash Expert Report ("Cash Report"), Doc. 24-6, at 3.) There is no dispute regarding the origin and cause of the fire. Because Cash's testimony is unnecessary, TAF's motion to exclude his testimony is moot.

## IV. CONCLUSION

In sum, the following **IS HEREBY ORDERED**:

(1) Plaintiff AMCO's motion for partial summary judgment (Doc. 18) is **GRANTED**. Thus Defendant TAF is liable to AMCO in the amount of **$886,792.83**;

(2) AMCO's motion to exclude testimony of defense expert William Creeden, P.E. (Doc. 20) is **GRANTED**;

(3) AMCO's motion to exclude testimony of defense expert Mark M. Ruddy (Doc. 21) is **DENIED**;

(4) TAF's motion to exclude testimony of plaintiff expert Michael R. Austin (Doc. 22) is **DENIED**;

(5) TAF's motion to exclude testimony of plaintiff expert Jeffrey C. Smith, C.P.A. (Doc. 23) is **DENIED AS MOOT**;

(6) TAF's motion to exclude the testimony of plaintiff expert Bryan K. Cash is **DENIED AS MOOT**;

(7) TAF's request for oral argument (Doc. 31) is **DENIED**.

The Clerk is directed to **ENTER JUDGMENT** in the amount of **$886,792.83** in favor of Plaintiff AMCO and against Defendant TAF. This case shall proceed to trial on the remaining disputed damages.

**ORDER ENTERED** at Augusta, Georgia, this 26th day of September, 2018.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA